IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAVIER M. NUNEZ and WALTER RODRIGUEZ<br><br>Defendants. | ORDER & MEMORANDUM DECISION<br><br>2:05CR239 TC |

On April 13, 2005, Javier M. Nunez and Walter Rodriguez were indicted on one count of possession of five kilograms or more of a mixture or substance containing cocaine with the intent to distribute and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. This matter is before the court on Mr. Nunez and Mr. Rodriguez's motions to suppress evidence allegedly obtained in violation of their Fourth Amendment rights.

Mr. Nunez and Mr. Rodriguez were stopped by a Utah Highway Patrol trooper on April 2, 2005, for a traffic violation. Mr. Rodriguez and Mr. Nunez contend that their detention was illegally prolonged and that all evidence obtained as a result of the protracted detention should be suppressed. Based upon an apparently fraudulent and expired driver's license provided to the trooper, a strong odor of air freshener, and the general extreme nervousness of Mr. Rodriguez and Mr. Nunez, the court finds that the trooper had reasonable suspicion to believe that Mr. Nunez and Mr. Rodriguez were engaged in criminal activity. Accordingly, the motion to suppress is DENIED.

## FACTS[1]

This case arises from the stop of Mr. Nunez and Mr. Rodriguez on April 2, 2005, by Utah Highway Patrol Trooper Ryan Bauer. Trooper Bauer testified at the June 20, 2005 evidentiary hearing.

On April 2, 2005, Trooper Bauer was driving north on I-15 in Beaver County, Utah, and saw a green Honda Odyssey Minivan in the fast lane driving at approximately 60 miles per hour. The posted speed limit on this stretch of I-15 is 75 miles per hour. Trooper Bauer followed the minivan for short distance to see if the driver would pull into the right lane of the freeway which is generally used by slower vehicles. The driver of the minivan did not change lanes. Trooper Bauer then pulled alongside the minivan and saw two people inside. Trooper Bauer testified that the two people– later identified as Mr. Rodriguez and Mr. Nunez – were startled to see a police car pull alongside them. (Transcript of June 20, 2005 Evidentiary Hearing ("Tr.") at 14.)

While he drove beside the minivan, Trooper Bauer noticed a crack in the minivan's windshield which is a violation of Utah law. Trooper Bauer pulled the Defendants over and walked to the passenger side of the minivan. Mr. Nunez was the driver of the minivan and Mr. Rodriguez was the passenger. During the course of the stop, Trooper Bauer spoke primarily with Mr. Rodriguez and Mr. Nunez remained silent.

Trooper Bauer testified that when he began speaking with Mr. Rodriguez and Mr. Nunez, they appeared very nervous. Trooper Bauer testified that Mr. Rodriguez and Mr. Nunez were smoking nervously and shaking.[2] Trooper Bauer also testified that he noticed an

---

[1]Unless otherwise noted, all facts are derived from testimony and evidence presented at the June 20, 2005 evidentiary hearing.

[2] The court noticed that Trooper Bauer, at times, had a tendency to exaggerate (i.e., Trooper Bauer, regarding the Defendants' nervousness testified: "they were shaking so badly, they would actually reach the cigarettes up, and many times they's actually miss their mouth. I

"overwhelming" odor of air freshener in the minivan. (Tr. at 17.) Trooper Bauer testified:

> While I was having this conversation with them, I noticed – the one thing that I felt like the possible odor could be coming from was . . . the largest air freshener that I have ever seen, lying on the floor up in front of the seat, kind of in the center console area, only on the floor of the van.

(Id. at 27.) A photograph of the air freshener retrieved from the minivan shows that it is a square flat air freshener approximately eight inches by eight inches in size. Trooper Bauer testified that the air freshener caused some concern because air fresheners are "often used to mask the odor of illegal substances." (Id. at 17, 27.)

Trooper Bauer asked Mr. Nunez for his driver's license, registration and explained the reason for the stop. While waiting for Mr. Nunez to find the requested documents, Trooper Bauer began to talk with Mr. Rodriguez about the trip. He testified that both Mr. Rodriguez and Mr. Nunez avoided making eye contact with him and generally acted in a deceptive manner. (Tr. at 24-25.) Trooper Bauer also asked whether the car was a rental to which Mr. Rodriguez responded that the minivan belonged to his "uncle's husband." (Id. at 20-21.) It is apparent from the video recording of the traffic stop, which the court has reviewed, that, while Mr. Rodriguez is able to speak English, he does so with difficulty.

Answering Trooper Bauer's questions, Mr. Rodriguez stated that he had borrowed the car in New York after traveling there from Puerto Rico and that he and Mr. Nunez had decided to take a trip to Las Vegas. Mr. Rodriguez told Trooper Bauer that they had stayed at a Motel 6 in Las Vegas and had visited the New York New York Casino. The video recording of the stop shows that although Mr. Rodriguez had difficulty describing the location of their motel and

---

saw them hit their nose a couple of times, and their cheeks, without actually making it to their mouth with the cigarettes." (Tr. at 22.)). But Trooper Bauer's testimony, for the most part, was credible. Further, key points of his testimony, such as Mr. Nunez's driver's license and the presence of an air freshener, were independently corroborated.

describing which casinos they had visited, it is apparent that this difficulty stemmed primarily from his difficulty with English and not from an attempt to fabricate an acceptable story, as the government suggests.

Trooper Bauer testified that there was a map of California on the back seat of the minivan, which, according to Trooper Bauer, was inconsistent with Mr. Rodriguez's account of their trip. But the video of the traffic stop shows that the map was not found until after Trooper Bauer began his search of the car. Accordingly, the court does not consider whether the presence of this map contributed to Trooper Bauer's reasonable suspicion that Mr. Rodriguez and Mr. Nunez were engaged in criminal activity.

Approximately three minutes after Trooper Bauer first approached the minivan, Mr. Nunez produced a driver's license that, on its face, was issued in Puerto Rico. But to Trooper Bauer, the license looked false and, at any rate, was expired. Mr. Nunez's driver's license was in evidence at the June 20, 2005 evidentiary hearing. (June 20, 2005 Evid. Hrg., Ex. 3.) Trooper Bauer testified: "This [license] appears to be not very professionally done. The picture is actually crooked being cut out. It's just placed on top of the paper underneath the plastic. The typing on [the license] also doesn't appear to be professionally done." (Tr. at 26.) (The court examined Mr. Nunez's license and found that it looks suspicious for essentially the reasons stated by Trooper Bauer.)

At some point Trooper Chad McWilliams arrived as backup and tried to confirm the validity of Mr. Nunez's license in a book with "all kinds of different IDs," but this proved inconclusive. (Tr. at 36.) Trooper Bauer returned to his car and tried to verify the validity of the licenses, but found the local dispatcher did not have the capability to verify the validity of either Mr. Rodriguez's license or Mr. Nunez's license. Through the dispatcher, Trooper Bauer also

discovered that the minivan had not been reported stolen and that the name on the registration matched the available records. While in his patrol car, Trooper Bauer attempted to make a record of his observations. Specifically, Trooper Bauer commented on the extreme nervousness of Mr. Rodriguez and Mr. Nunez.

Trooper Bauer returned to the minivan and asked Mr. Rodriguez to step out of the car and speak with him. Trooper Bauer told Mr. Rodriguez that he didn't believe Mr. Nunez's license was valid and explained his reasoning. Trooper Bauer then asked additional questions about their trip to Las Vegas. Mr. Rodriguez said that he had arrived in New York from Puerto Rico about two or three weeks earlier and had stayed at his aunt's home. Mr. Rodriguez said his aunt was named Melinda Vazquez and that the minivan belonged to her husband Merqueado Vazquez. This information is consistent with the information on the minivan's registration. Mr. Rodriguez told Trooper Bauer that he and Mr. Nunez had only traveled to Las Vegas and nowhere else. But Mr. Rodriguez had difficulty recalling the exact dates of their trip. Mr. Rodriguez said that he and Mr. Nunez had not traveled from Puerto Rico together, but had met in New York. Mr. Rodriguez also told Trooper Bauer that Mr. Nunez was his cousin's cousin. Trooper Bauer eventually told Mr. Rodriguez that, despite his belief that Mr. Nunez's driver's license was fake, he was not going to write him a ticket.

Trooper Bauer testified that, during the course of the stop, he came to believe that Mr. Rodriguez and Mr. Nunez were involved in illegal activity primarily because of the appearance of Mr. Nunez's driver's license, the Defendants' "reactions to [him] being around them [deceptiveness], their extreme nervousness, the overwhelming odor of air freshener, very large air freshener, [and] the way that they were acting smoking their cigarettes." (Tr. at 24-25, 30-32, 37-38.) Based on his suspicion, he asked Mr. Rodriguez: "Is there anything illegal in this

vehicle? Are there any drugs, [etc.], inside this vehicle?" (Id. at 40.) Mr. Rodriguez responded: "You can search it." (Id. at 41.) Trooper Bauer testified: "I said to [Mr. Rodriguez], 'So I can search the vehicle?' And he again confirmed with me that I could search the vehicle." (Id.)

Trooper Bauer gave Mr. Nunez a warning ticket and told Mr. Rodriguez to explain to Mr. Nunez that the officers would be searching the minivan and that he had given his consent. Mr. Nunez got out of the minivan and he and Mr. Rodriguez were searched. Using a drug detection dog the officers then searched the minivan and found illegal drugs in a hidden compartment.

**ANALYSIS**

In the current motion, Mr. Rodriguez and Mr. Nunez raise one issue: They contend that the traffic stop was illegally extended in violation of their Fourth Amendment rights. Mr. Rodriguez and Mr. Nunez do not challenge either the validity of the initial stop or Mr. Rodriguez's consent to search.[3]

A traffic stop is generally analyzed "under the principles pertaining to investigatory detentions." United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). A court asks "first whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place." Id. Because Mr. Rodriguez and Mr. Nunez concede that the stop was justified at its inception, the only question is whether Trooper Bauer's questioning of Mr. Rodriguez regarding the presence of contraband exceeded the scope of the investigative detention.

---

[3] The court notes that the government contends that Mr. Nunez does not have standing to challenge the search and, at final argument on this motion, the court requested supplemental briefing on this issue. But because of the court's conclusion, the court does not need to examine whether he has standing to challenge the search.

A traffic stop may be prolonged through further questioning in two circumstances: First, if the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring" or, second, "if the initial detention has become a consensual encounter." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998); see also United States v. Cervine, 347 F.3d 865, 868-69 (10th Cir. 2003). Here, Trooper Bauer testified that the encounter was not consensual. (Tr. at 47.)

When determining whether reasonable suspicion exists, a court looks to the totality of the circumstances to see whether the officer has a "particularized and objective basis for suspecting legal wrongdoing." United States v. Bradford, 423 F.3d 1149, 1157 (10th Cir. 2005) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). Here, the government asserts that the strong odor of air freshener in the minivan, Mr. Nunez's apparently fraudulent driver's license, and the excessive nervousness exhibited by Mr. Nunez and Mr. Rodriguez suffice to create reasonable suspicion justifying protraction of the stop.[4]

Trooper Bauer testified extensively about the overwhelming scent of air freshener. Specifically, Trooper Bauer testified that he was "blasted in the face with an 'overwhelming' odor of air freshener" and that he saw a large air freshener between the driver and passenger seats on the floor of the minivan. (Tr. at 17.) The Tenth Circuit has "repeatedly held that air freshener coupled with other indicia of criminal activity supports a reasonable brief inquiry . . . . The fact that air freshener . . . may be used innocently does not mean that it cannot be used under other suspicious circumstances." United States v. Villa-Chapparo, 115 F.3d 797, 802 (10th Cir. 1997)

---

[4]The government has also asserted other bases for Trooper Bauer's suspicion including inconsistent accounts of travel plans. But, having carefully reviewed the testimony of Trooper Bauer and the video recording of the traffic stop, the court finds that the facts surrounding those assertions are not sufficiently established so as to contribute to a finding of reasonable suspicion.

(quoting United States v. Alvarez, 68 F.3d 1242, 1245 (10th Cir. 1995) (McKay, J., concurring)); see also United States v. Martin, 86 Fed. Appx. 364, 365 (10th Cir. 2003) (unpublished); United States v. Garcia-Rodriguez, 127 Fed. Appx. 440, 445-46 (10th Cir. 2005) (unpublished). A photograph of the air freshener found during the stop indicates that it was approximately eight inches by eight inches and the court does not doubt that there was a significant odor of air freshener in the minivan. (June 20, 2005 Evid. Hrg., Ex. 5). Trooper Bauer testified that his suspicions were heightened because, in his experience, the scent of air freshener is often used to conceal the odor of illegal drugs.

The government also contends that the suspect driver's license given by Mr. Nunez contributes to a finding of reasonable suspicion. "In the context of a traffic stop, courts have concluded that driving without a valid driver's license may support a finding of reasonable suspicion." United States v. Robles, 313 F. Supp.2d 1206, 1216 (D.Utah 2004) (citing United States v. Garcia, 52 F. Supp.2d 1239, 1250-51 (D. Kan. 1999)); see also United States v. Hunnicutt, 135 F.3d 1345, 1349 n. 1 (10th Cir. 1998) (citing United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995)). After being stopped by Trooper Bauer, Mr. Nunez, the driver of the minivan, produced a driver's license from Puerto Rico that appeared to Trooper Bauer to be fraudulent. The court has examined the driver's license provided by Mr. Nunez and agrees that its general appearance raises questions about its validity. And the court finds that the appearance and facial invalidity of Mr. Nunez's license contributes to a finding of reasonable suspicion.

Finally, the government contends that Mr. Rodriguez and Mr. Nunez appeared excessively nervous throughout the course of the stop and that this contributes to a finding that Trooper Bauer possessed the requisite reasonable suspicion to prolong the detention. When a driver is detained during a stop for a traffic violation, his nervousness "may be considered as part

of the totality of the circumstances a reasonable law enforcement officer would analyze in investigating possible crimes." United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005); see also, Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) ( nervousness is a "pertinent factor in determining reasonable suspicion."); United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004); United States v. Valenzuela, 365 F.3d 892, 901-02 (10th Cir. 2004); United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003). But nervousness is also a common reaction to being stopped by a law enforcement officer and the Tenth Circuit has recently written that "unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is '"of limited significance" in determining whether reasonable suspicion exists.'" Santos, 403 F.3d at 1127. "Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion." Id.

Here, Trooper Bauer testified that from the moment he pulled alongside the minivan while it was traveling, the Defendants seemed extremely nervous. Trooper Bauer testified that they looked like "deer in the headlights." (Tr. at 14.) Trooper Bauer also testified that throughout his encounter Mr. Rodriguez and Mr. Nunez were aggressively smoking, that they were physically shaking, and that they were trying to avoid eye contact. Mr. Rodriguez and Mr. Nunez contend that the video recording contradicts Trooper Bauer's account. But the court disagrees. Because of the quality of the picture and sound on the video of the traffic stop, the court cannot determine whether the Defendants were nervous.

While, none of the above factors is alone sufficient to create reasonable suspicion to justify prolonging the detention of Mr. Rodriguez and Mr. Nunez, together they establish reasonable suspicion sufficient to allow Trooper Bauer to inquire about the presence of illegal drugs and, with the consent of Mr. Rodriguez, search the vehicle.

**ORDER**

For the reasons set forth, Defendants' motions to suppress are DENIED.

SO ORDERED this 16th day of November, 2005.

BY THE COURT:

TENA CAMPBELL
United States District Judge